### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GUCCI AMERICA, INC., | No. 1:25-cv-03563 (LAP) |
| Plaintiff, | |
| v. | |
| IV MEDIA, LLC, FAMJAMS TRADING, LLC, and DOES 1-10, | **ANSWER AND CROSS-CLAIMS** |
| Defendants. | |
| IV MEDIA, LLC, | |
| Cross-Claimant, | |
| v. | |
| FAMJAMS TRADING, LLC and DOES 1-10, | |
| Cross-Defendants. | |

Defendant IV Media, LLC d/b/a ShopHQ ("ShopHQ"), by and through its undersigned counsel, answers the Complaint of Plaintiff Gucci America, Inc. ("Gucci") dated April 30, 2025, as follows:

### SUBSTANCE OF THE ACTION[1]

1.      ShopHQ lacks information or knowledge sufficient to admit or deny the allegations set forth in Paragraph 1 and on that basis denies them.

2.      Paragraph 2 contains legal conclusions requiring no response.

3.      Paragraph 3 contains legal conclusions requiring no response.

---

[1] ShopHQ neither admits nor denies the contents of the various headings and subheadings in the Complaint, which are reproduced herein solely for convenience.

**THE PARTIES**

4.      ShopHQ lacks information or knowledge sufficient to admit or deny the allegations in Paragraph 4 and on that basis denies them.

5.      ShopHQ admits the allegations in Paragraph 5.

6.      ShopHQ lacks information or knowledge sufficient to admit or deny the allegations in Paragraph 6 and on that basis denies them.

7.      ShopHQ denies that it "conspired with and/or aided and/or abetted" Famjams or the fictitiously named defendants sued herein as Does 1 through 10, and denies that it engaged in "wrongful conduct." The remaining allegations in Paragraph 7 are directed at fictitiously named defendants sued herein as Does 1 through 10, and on that basis ShopHQ makes no response.

**JURISDICTION AND VENUE**

8.      Paragraph 8 contains legal conclusions requiring no response.

9.      Paragraph 9 contains legal conclusions requiring no response.

10.     Paragraph 10 contains legal conclusions requiring no response.

11.     Paragraph 10 contains legal conclusions requiring no response.

**FACTS GIVING RISE TO THIS ACTION**

12.      ShopHQ lacks information or knowledge sufficient to admit or deny the allegations set forth in Paragraph 12, and on that basis denies them.

13.      ShopHQ lacks information or knowledge sufficient to admit or deny the allegations set forth in Paragraph 13, and on that basis denies them.

14.     ShopHQ lacks information or knowledge sufficient to admit or deny the allegations set forth in Paragraph 14, and on that basis denies them.

15.     ShopHQ lacks information or knowledge sufficient to admit or deny the allegations set forth in Paragraph 15, and on that basis denies them.

16.     ShopHQ lacks information or knowledge sufficient to admit or deny the allegations set forth in Paragraph 16, and on that basis denies them.

17.     ShopHQ lacks information or knowledge sufficient to admit or deny the allegations set forth in Paragraph 17, and on that basis denies them.

18.     ShopHQ lacks information or knowledge sufficient to admit or deny the allegations set forth in Paragraph 18, and on that basis denies them.

19.     ShopHQ lacks information or knowledge sufficient to admit or deny the allegations set forth in Paragraph 19, and on that basis denies them.

20.     ShopHQ lacks information or knowledge sufficient to admit or deny the allegations set forth in Paragraph 20, and on that basis denies them.

21.     ShopHQ refers to Exhibit A to the Complaint for its terms, lacks information or knowledge sufficient to admit or deny the factual allegations in Paragraph 21, and on that basis denies them. The remaining allegations in Paragraph 21 contain legal conclusions requiring no response.

22.     ShopHQ lacks information or knowledge sufficient to admit or deny the allegations set forth in Paragraph 22, and on that basis denies them.

23.     ShopHQ lacks information or knowledge sufficient to admit or deny the allegations set forth in Paragraph 23, and on that basis denies them.

**Defendant's Conduct**

24.     ShopHQ admits the allegations in Paragraph 24.

25.     ShopHQ admits only that it "advertised, offered for sale and sold" handbags. ShopHQ otherwise lacks knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 25, and on that basis denies them.

26.     ShopHQ lacks information or knowledge sufficient to admit or deny the allegations in Paragraph 26, and on that basis denies them.

27.     ShopHQ lacks information or knowledge sufficient to admit or deny the allegations in Paragraph 27, and on that basis denies them.

28.     ShopHQ lacks information or knowledge sufficient to admit or deny the allegations in Paragraph 28, and on that basis denies them.

29.     ShopHQ denies the allegations in Paragraph 29.

30.     ShopHQ lacks information or knowledge sufficient to admit or deny the allegations in Paragraph 30, and on that basis denies them.

31.     ShopHQ admits the allegations in Paragraph 31.

32.     ShopHQ admits only that it "acknowledged receipt of a letter" and that it "had removed" Gucci handbags sold by Famjams from its website. ShopHQ otherwise lacks knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 32, and on that basis denies them.

33.     ShopHQ admits only that counsel for ShopHQ responded via email reiterating that all Gucci products that had been for sale on either ShopHQ's websites or on TV have been removed and are not currently being offered for sale since the time of its receipt of Gucci's demand letter, and it was collecting vendor sales information. ShopHQ otherwise lacks knowledge or information

sufficient to admit or deny the remaining allegations in Paragraph 33, and on that basis denies them.

34.     ShopHQ admits only that it retained counsel and that the parties "have not been able to come to an agreement to settle this dispute." ShopHQ otherwise lacks knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 34, and on that basis denies them.

35.     ShopHQ admits only that in October 2024, counsel advised Gucci that the identified products had been purchased from Famjams and that Famjams provided assurances of authenticity for the products. ShopHQ otherwise lacks knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 35, and on that basis denies them.

36.     The allegations in Paragraph 36 are directed at Famjams, and on that basis ShopHQ makes no response.

37.     The allegations in Paragraph 37 are directed at Famjams, and on that basis ShopHQ makes no response.

38.     The allegations in Paragraph 38 are directed at Famjams, and on that basis ShopHQ makes no response.

39.     ShopHQ admits only that "it is not related to or affiliated with Gucci in any way" and otherwise lacks information or knowledge sufficient to admit or deny the allegations set forth in Paragraph 39, and on that basis denies them.

40.     ShopHQ lacks information or knowledge sufficient to admit or deny the allegations set forth in Paragraph 40, and on that basis denies them.

41.     Paragraph 41 contains legal conclusions requiring no response.

42.     Paragraph 42 contains legal conclusions requiring no response.

**FIRST CAUSE OF ACTION**
**Trademark Counterfeiting and Infringement of Registered Trademarks in Violation of 15 U.S.C. § 1114(1)**

43.     ShopHQ repeats and realleges each and every response contained in the paragraphs above as if fully set forth at length herein.

44.     ShopHQ lacks information or knowledge sufficient to admit or deny the allegations set forth in Paragraph 44, and on that basis denies them.

45.     ShopHQ denies it manufactured, imported, and/or exported Gucci bags. ShopHQ otherwise lacks information or knowledge sufficient to admit or deny the allegations set forth in Paragraph 45, and on that basis denies them.

46.     Paragraph 46 contains legal conclusions requiring no response.

47.     Paragraph 47 contains legal conclusions requiring no response.

48.     Paragraph 48 contains legal conclusions requiring no response.

49.     Paragraph 49 contains legal conclusions requiring no response.

50.     Paragraph 50 contains legal conclusions requiring no response.

**SECOND CAUSE OF ACTION**
**Unfair Competition in Violation of 15 U.S.C. § 1125(a)**

51.     ShopHQ repeats and realleges each and every response contained in the paragraphs above as if fully set forth at length herein.

52.     ShopHQ lacks information or knowledge sufficient to admit or deny the allegations set forth in Paragraph 52, and on that basis denies them.

53.     ShopHQ denies it manufactured, imported, and/or exported Gucci bags. ShopHQ otherwise lacks information or knowledge sufficient to admit or deny the allegations set forth in Paragraph 53, and on that basis denies them.

54.     Paragraph 54 contains legal conclusions requiring no response.

55.    Paragraph 55 contains legal conclusions requiring no response.

56.    ShopHQ denies that its conduct was undertaken with reckless disregard or knowingly, willfully, and in bad faith. ShopHQ otherwise lacks information or knowledge sufficient to admit or deny the allegations set forth in Paragraph 56, and on that basis denies them.

57.    Paragraph 57 contains legal conclusions requiring no response.

58.    Paragraph 58 contains legal conclusions requiring no response.

## THIRD CAUSE OF ACTION
### False Designation of Origin in Violation of 15 U.S.C. § 1125(a)

59.    ShopHQ repeats and realleges each and every response contained in the paragraphs above as if fully set forth at length herein.

60.    Paragraph 60 contains legal conclusions requiring no response.

61.    Paragraph 61 contains legal conclusions requiring no response.

62.    ShopHQ denies it acted willfully and that it intends to continue to act willfully. ShopHQ otherwise lacks information or knowledge sufficient to admit or deny the remaining allegations set forth in Paragraph 62, and on that basis denies them.

63.    Paragraph 63 contains legal conclusions requiring no response.

64.    Paragraph 64 contains legal conclusions requiring no response.

## FOURTH CAUSE OF ACTION
### Dilution in Violation of 15 U.S.C. § 1125(c)

65.    ShopHQ repeats and realleges each and every response contained in the paragraphs above as if fully set forth at length herein.

66.    ShopHQ lacks information or knowledge sufficient to admit or deny the allegations set forth in Paragraph 66, and on that basis denies them.

67.    Paragraph 67 contains legal conclusions requiring no response.

68.     ShopHQ denies it acted willfully, deliberately, or with reckless disregard. ShopHQ otherwise lacks information or knowledge sufficient to admit or deny the allegations set forth in Paragraph 68, and on that basis denies them.

69.     Paragraph 69 contains legal conclusions requiring no response.

70.     Paragraph 70 contains legal conclusions requiring no response.

<u>**FIFTH CAUSE OF ACTION**</u>
**Common Law Trademark Infringement**

71.     ShopHQ repeats and realleges each and every response contained in the paragraphs above as if fully set forth at length herein.

72.     Paragraph 72 contains legal conclusions requiring no response.

73.     Paragraph 73 contains legal conclusions requiring no response. ShopHQ otherwise lacks information or knowledge sufficient to admit or deny the factual allegations in Paragraph 73, and on that basis denies them.

74.     ShopHQ denies it manufactured, imported, and/or exported Gucci bags. ShopHQ otherwise lacks information or knowledge sufficient to admit or deny the allegations set forth in Paragraph 74, and on that basis denies them.

75.     ShopHQ denies its conduct was reckless and/or intentional and willful. ShopHQ otherwise lacks information or knowledge sufficient to admit or deny the allegations set forth in Paragraph 75, and on that basis denies them.

76.     Paragraph 76 contains legal conclusions requiring no response.

77.     Paragraph 77 contains legal conclusions requiring no response.

78.     Paragraph 78 contains legal conclusions requiring no response.

## SIXTH CAUSE OF ACTION
### New York Unfair Competition

79.     ShopHQ repeats and realleges each and every response contained in the paragraphs above as if fully set forth at length herein.

80.     Paragraph 80 contains legal conclusions requiring no response. ShopHQ otherwise lacks information or knowledge sufficient to admit or deny the factual allegations in Paragraph 80, and on that basis denies them.

81.     Paragraph 81 contains legal conclusions requiring no response.

82.     Paragraph 82 contains legal conclusions requiring no response. ShopHQ otherwise denies the factual allegations set forth in Paragraph 82.

83.     Paragraph 83 contains legal conclusions requiring no response.

84.     Paragraph 84 contains legal conclusions requiring no response.

85.     Paragraph 85 contains legal conclusions requiring no response.

## SEVENTH CAUSE OF ACTION
### Dilution in Violation of N.Y. Bus. Law §360-L

86.     ShopHQ repeats and realleges each and every response contained in the paragraphs above as if fully set forth at length herein.

87.     Paragraph 87 contains legal conclusions requiring no response.

88.     Paragraph 88 contains legal conclusions requiring no response.

89.     Paragraph 89 contains legal conclusions requiring no response. ShopHQ otherwise lacks information or knowledge sufficient to admit or deny the factual allegations set forth in Paragraph 89, and on that basis denies them.

90.     Paragraph 90 contains legal conclusions requiring no response. ShopHQ otherwise denies the allegations set forth in Paragraph 90.

91.     Paragraph 91 contains legal conclusions requiring no response. ShopHQ otherwise denies the allegations set forth in Paragraph 91.

92.     Paragraph 92 contains legal conclusions requiring no response. ShopHQ otherwise denies the allegations set forth in Paragraph 92.

93.     Paragraph 93 contains legal conclusions requiring no response.

## REQUEST FOR RELIEF

ShopHQ denies that Plaintiff is entitled to any damages, monetary relief, or declaratory judgement.

## AFFIRMATIVE DEFENSES

Without assuming the burden of proof where such burden is otherwise on the Plaintiff as a matter of applicable substantive or procedural law, ShopHQ asserts the following affirmative defenses:

## FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims against ShopHQ are barred because Plaintiff's damages, if any, were not caused by ShopHQ.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims against ShopHQ are barred because ShopHQ has not done anything likely to cause confusion or mistake with respect to Plaintiff or Plaintiff's products, and/or ShopHQ has not infringed on Plaintiff's rights or products.

## THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims against ShopHQ are barred by the doctrine of laches as Plaintiff had knowledge of the complained-of activity well before filing the Complaint yet Plaintiff unreasonably delayed in bringing its claims, which has prejudiced ShopHQ.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims against ShopHQ are barred because the Complaint does not provide clear and convincing evidence of infringement.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff is not entitled to injunctive relief (temporary, preliminary, or permanent), because any injury to it is not immediate or irreparable, Plaintiff has an adequate remedy at law, the balance of hardships favors no injunction, and the public interest is best served by no injunction.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims against ShopHQ are barred because Plaintiff has failed to state a claim upon which relief can be granted, in law or in equity.

## SEVENTH AFFIRMATIVE DEFENSE

Without admitting that the Complaint states a claim, Plaintiff's claims are barred, in whole or in part, because there has been no damage in any amount, manner or at all by reason of any act alleged against ShopHQ in the Complaint, because ShopHQ did not cause Plaintiff's alleged damages, and/or because Plaintiff's alleged damages against ShopHQ are speculative and any recovery against ShopHQ would unjustly enrich Plaintiff.

## EIGTH AFFIRMATIVE DEFENSE

The Complaint is barred, in whole or in part, because ShopHQ's conduct and/or actions were made in good faith.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff is not entitled to attorneys' fees, investigative fees or costs.

## TENTH AFFIRMATIVE DEFENSE

The Complaint is barred, in whole or in part, because a third party(ies) owes contribution and/or indemnification to ShopHQ for the damages alleged by Plaintiff.

## ELEVENTH AFFIRMATIVE DEFENSE

The Complaint is barred, in whole or in part, by the doctrine of mutual mistake of fact.

## TWELFTH AFFIRMATIVE DEFENSE

The claims against ShopHQ are barred because ShopHQ reasonably relied on Famjams' representations and warranties regarding the authenticity of the goods based on its long-standing trusted relationship and prior course of dealings.

## THIRTEENTH AFFIRMATIVE DEFENSE

If any damages exist, Plaintiff's claims are barred by Plaintiff's failure to mitigate its damages and because the alleged actions by ShopHQ were necessary to mitigate its own losses.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part by the doctrines of waiver, abandonment, consent, ratification, release, forfeiture, and/or estoppel.

## FIFTHTEENTH AFFIRMATIVE DEFENSE

ShopHQ reserves the right to assert additional defenses that may be uncovered during the course of this action. ShopHQ has insufficient knowledge or information to determine whether it may have additional, as yet unstated, affirmative defenses available. ShopHQ has not knowingly or intentionally waived any applicable additional affirmative defenses and reserves the right to raise additional defenses as they become known to ShopHQ through discovery in this matter. ShopHQ further reserves the right to amend this Answer, to add, delete, or modify defenses based upon legal theories that may be divulged through discovery, or further legal analysis.

## CROSS-CLAIMANT IV MEDIA, LLC D/B/A SHOPHQ'S
## CROSS-CLAIMS

Defendant and Cross-Claimant IV Media, LLC d/b/a ShopHQ ("ShopHQ"), by and through its attorneys, Harris St. Laurent & Wechsler LLP, for its cross-claims, states as follows upon personal knowledge as to itself and its own acts and otherwise upon information and belief:

## INTRODUCTION

1.    Shop HQ's claims arise from the same facts and allegations as asserted by Plaintiff Gucci America, LLC ("Plaintiff" or "Gucci") in its April 30, 2025 complaint (the "Complaint") alleging that ShopHQ and its supplier Famjams Trading, LLC ("Famjams") were selling counterfeit Gucci handbags in violation of federal and state trademark laws. When ShopHQ received a demand letter from Plaintiff in April 2024 (the "Gucci Demand Letter") describing these violations, ShopHQ was shocked to learn that it might have unknowingly purchased counterfeit Gucci handbags, immediately stopped selling Gucci products, and promptly investigated the allegations.

2.    ShopHQ, and its predecessor company, iMedia Brands, Inc. d/b/a ShopHQ ("iMedia"),[2] which ShopHQ purchased in a Chapter 11 bankruptcy sale in August 2023, bought the Gucci-branded products at issue from a longtime and seemingly reliable vendor, Cross-Defendant Famjams. Famjams is a company wholly owned and managed by Michael Friedman ("Friedman"), who was serving as a Director of iMedia when iMedia began purchasing Gucci-branded products from Famjams. ShopHQ and iMedia relied on the representation and warranties made by Famjams in reasonably believing that all the Gucci-branded products purchased were authentic, without flaw, and merchantable. To the extent Gucci can prove its claims, ShopHQ is

---

[2] iMedia, formerly known as ValueVision, ShopNBC, Evine Live, and Evine, owned and operated a home shopping network, including television and more recently an online shopping website (the "ShopHQ Platform").

entitled to recover against Famjams for selling products it falsely represented were authentic, when it knew or should have known they were not, in violation of the parties' various agreements and New York and/or Minnesota law.

## THE PARTIES

3.      Cross-Claimant ShopHQ is a Michigan limited liability company with a principal place of business at 38955 Hills Tech Drive, Farmington Hills, MI 48331.

4.      Upon information and belief, Cross-Defendant Famjams is a limited liability company with a principal place of business at 2361 Nostrand Avenue, Suite 803, Brooklyn, NY 11210.

5.      Upon information and belief, and based on the allegations in Plaintiff's Complaint, ShopHQ asserts that the fictitiously named Does 1-10, inclusive, and each of them, are in some manner responsible or legally liable for the actions, events, transactions, and/or circumstances alleged by Plaintiff and ShopHQ herein. ShopHQ believes, and based thereon, alleges that one or more of the Does that Famjams conspired with and/or aided and abetted Famjams in its wrongful conduct as alleged herein. The true names and capacities of such fictitiously named cross-defendants, whether individual, corporate, associate, or otherwise, are presently unknown to ShopHQ, and at the appropriate time ShopHQ will seek leave to amend its pleading to assert the true names and capacities of such fictitiously named cross-defendants.

## JURISDICTION AND VENUE

6.      This Court has personal jurisdiction over Famjams pursuant to Fed. R. Civ. P. 4(k)(A) and N.Y. CPLR §§ 301 and 302, as it is a citizen of New York, solicits, transacts, and conducts business in this District, and committed tortious acts in this District.

7.     The Court has supplemental jurisdiction over the subject of ShopHQ's cross-claims pursuant to 28 U.S.C. § 1367 as the Court has original jurisdiction over the Complaint pursuant to the Lanham Act, 15 U.S.C. §§ 1501, *et seq*.

8.     The claims set forth herein arise out of and are part of the same transaction or occurrences as alleged in Plaintiff's Complaint, and the determination of all claims in one proceeding is necessary and appropriate in order to avoid the multiplicity of actions that will result if ShopHQ were required to defend Plaintiff's claims, and then bring a separate action against Famjams and Does 1-10 for the damages caused to ShopHQ and indemnification/contribution of any sums which Famjams and Does 1-10 may be compelled to pay as a result of any damages, judgment, or other awards arising out of the transactions or occurrences that are the subject matter of Plaintiff's Complaint.

## FACTUAL BACKGROUND

**A. iMedia's Introduction to Michael Friedman and Famjams by Invicta Watch Company of America, Inc.**

9.     ShopHQ's predecessor, iMedia, had been buying and selling products licensed by Invicta Watch Company of America, Inc. ("Invicta") since 2003.

10.     Upon information and belief, Invicta is an American watch designer and manufacturer selling stylish and affordable watches through multi-channel retailing, including its own stores, third-party dealers, e-commerce, and television shopping networks like the ShopHQ Platform. Upon further information and belief, Eyal Lalo is the Chief Executive Officer and the controlling shareholder of Invicta.

11.     Upon information and belief, Sterling Time LLC ("Sterling") is an affiliate of and the exclusive distributor of Invicta watches and watch accessories for television home shopping.

Upon further information and belief, Sterling is wholly owned by Friedman and his wife, Leah Friedman.

12.     Upon information and belief, Famjams is an affiliate of Sterling that is also wholly owned by Friedman. Upon further information and belief, Famjams is a wholesale supplier of manufactured goods, including designer luxury goods such as the Gucci-branded products that Plaintiff alleges are counterfeit. Upon further information and belief, Famjams does not manufacture goods itself; rather, it purchases its goods from manufacturers and suppliers, including Does 1-10, and then sells those goods to retailers like ShopHQ for sale directly to consumers.

13.     Upon information and belief, iMedia was introduced to Friedman and Famjams through Friedman's association and exclusive distribution relationship with Invicta. Based on Friedman's and Famjams' association with a reputable high-end brand liked Invicta, iMedia trusted that Famjams was also a reputable supplier of luxury and designer goods.

14.     Upon information and belief, iMedia sold products purchased from Famjams on the ShopHQ Platform.

**B.  Friedman Joins the iMedia Board of Directors and Enters into Purchase Agreements between iMedia and His Companies**

15.     Upon information and belief, based on the success of the sale of Invicta watches and Famjams products, iMedia entered into a series of agreements with Invicta, Sterling, and Famjams.

16.     On or about May 2, 2019, iMedia entered into a written agreement (the "Confidential Vendor Exclusivity Agreement") with Lalo on behalf of Invicta and Friedman on behalf of Sterling to market and sell Invicta products on the ShopHQ Platform that were to be distributed by Sterling.

17.     Also, in or around May 2019, as part of a common stock and warrant purchase agreement entered into by Friedman and iMedia, Friedman became a significant shareholder and director of iMedia.

18.     As a significant shareholder, one of the largest vendors, and a member of iMedia's Board of Directors, Friedman exerted substantial influence and control over iMedia.

19.     In December 2019, iMedia and Famjams executed a Master Services Agreement for Packing and Fulfillment Service ("MSA") of Products, defined as "any tangible goods for which Provider agrees to provide Fulfillment Services."

20.     The following definitions are also set forth in the MSA:

(a) Section 1.6 "**Fulfillment Products**" means the Products, as more fully specified in a SOW (as the same may be updated or amended from time to time upon the mutual written agreement of the Parties), which are delivered to Provider by Client or its agent for Fulfillment Services hereunder.

(b) Section 1.7 "**Fulfillment Services**" means the set-up, receiving, warehousing, picking, packing, fulfillment, shipping, returns processing, or other services, whether direct to consumer or direct to business, to be rendered by Provider under this Agreement and as set forth in a SOW.

21.     The MSA further includes promises, warranties, covenants and representations by Famjams that "each Fulfillment Product, together with all packaging, labels and other collateral materials provided by [Famjams] ('Related Materials') shall (a) be free from defects in manufacturing, workmanship or materials including without limitation such defects as would cause personal injury or create a hazard to life or injury or damage to property, (b) be fit for its intended purpose and be suitable for use and human consumption, be manufactured and otherwise be in compliance with all applicable federal, state and local laws and all orders and regulations promulgated thereunder, including without limitation any food labeling, disclosure and safety laws; (c) conform to all specifications and other descriptions set forth or incorporated herein, in a SOW, or other Related Materials, (d) possess all performance qualities and characteristics claimed

in advertisements or other printed materials issued or authorized by [Famjams] or the manufacturers or producers of the Products, …" MSA § 7.2.

22.    Pursuant to the MSA, Famjams also agreed to indemnify and defend against the claims asserted by Plaintiff in this action. Section 9.1, captioned "**Indemnification, Damages and Insurance**," expressly states in pertinent part:

> "Client [Famjams] hereby agrees to indemnify, defend and hold harmless Provider, its directors, officers, employees, agents and representatives from and against any and all claims, losses, demands, damages, costs, liabilities and expenses (including reasonable attorneys' fees and cost of settlement) (collectively, **"Losses')** resulting from or in connection with (i) any material breach of any representation, warranty or other obligation of Client hereunder, (ii) any damage or destruction of property or any injury to or death of persons resulting from any actual or alleged defect in the Products or Fulfillment Products or any act (or omission) of Client's employees, agents or representatives (including those of any supplier or manufacturer or Order Accumulator) with respect to the Products or Fulfillment Products, or (iii) **third party claims arising from or related to Provider's performance of the Fulfillment Services hereunder (including, without limitation, any customer or supplier claims relating to product quality or performance and any claims relating to intellectual property rights), unless such third party claims arise solely and directly from Provider's gross negligence or willful misconduct in performing the Fulfillment Services. Provider shall have the right to select counsel to conduct and shall control any defense subject to this provision**" (emphasis added).

23.    Section 9.3 of the MSA provides that the indemnification provisions "shall survive the termination of this Agreement."

24.    On or about June 9, 2021, in the midst of the COVID-19 pandemic, iMedia entered into another agreement with Famjams—the Confidential Vendor Exclusivity Agreement— pursuant to which iMedia agreed to exclusively market and sell Medic Therapeutics and Safety Vital products, medical, home health, and personal protection products, and other products on the ShopHQ Platform.

25.    Sterling was iMedia's largest vendor from 2009 through 2023. Based on the Confidential Vendor Exclusivity Agreement, Famjams was iMedia's second largest vendor from

2020 through June 2023, when it went into bankruptcy. Combined, products purchased from Sterling and Famjams amounted to 35% of iMedia's total annual sales in 2020, 33% in 2021 and 2022, and 23% in 2023 (before ShopHQ's acquisition of iMedia in August 2023).

**C.  iMedia Begins Purchasing Gucci products from Famjams in 2023**

26.    Upon information and belief, on or about January 5, 2023, based on the success of the sale of Famjams and Sterling products and Friedman's influence over product assortment as an iMedia Director and significant shareholder, iMedia expanded its offerings to include Gucci handbags supplied by Famjams.

27.    Famjams and its agents and representatives, including Friedman, guaranteed the authenticity of those handbags to both iMedia and, later, ShopHQ, and represented that Famjams was an authorized reseller of Gucci handbags.

28.    In or about December 2022 or, at the latest, January 2023, Daniel Rokowsky ("Rokowsky"), Manager of Famjams, or a member of his team, forwarded iMedia certain specifications for the Gucci handbags, including, among other things, representations that the handbags were each accompanied by a dust bag and certificate of authenticity, in compliance with iMedia's vendor onboarding requirements (the "Vendor Onboarding Summary"). iMedia (and then ShopHQ) posted the exact product descriptions provided by Famjams to ShopHQ's Platform to market and sell the Gucci handbags to consumers.

29.    Significantly, Rokowsky provided iMedia with a spreadsheet that provided a photo of and linked each handbag style purchased by iMedia from Famjams to the respective product page on Gucci's website, further representing and certifying the authenticity of each handbag:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 443497 DTDIT 1000 | 65 | $ 2,550.00 | $ 1,514.70 | https://www.gucci.com/us/en/pr/women/handbags/shoulder-bags-for-women/gg-marmont | $468880 | 10 | $ 15,147.00 | June |
| 447632 DTDIT 1000 | 70 | $ 1,790.00 | $ 1,063.26 | https://www.gucci.com/us/en/pr/women/handbags/shoulder-bags-for-women/gg-marmont | $468884 | 30 | $ 31,897.80 | May |
| 503877 K05NG 8745 | 40 | $ 1,980.00 | $ 1,176.12 | https://www.gucci.com/us/en/pr/women/handbags/shoulder-bags-for-women/ophidia-gg-small | $473314 | 12 | $ 14,113.44 | May |
| 550618 96I3B 8745 | 50 | $ 1,690.00 | $ 1,003.86 | https://www.gucci.com/us/en/pr/women/handbags/crossbody-bags-for-women/ophidia-gg-mini | $473312 | 12 | $ 12,046.32 | June |
| | | | | | Total | 64 | $ 73,204.56 | |

| | | | |
|---|---|---|---|
| Total | April | $ 19,008.00 | PO 1006295 | Del. 4/17 |
| | May | $ 64,128.24 | PO 1006297 | Del. 5/6 |
| | June | $ 97,713.00 | PO 1006300 | Del. 6/5 |
| | August | $ 19,008.00 | PO 1006304 | Del. 7/31 |
| | Sample PO | $ 3,344.22 | PO 1006299 | Del. 5/6 |

**D.  IV Media Purchases iMedia in a Bankruptcy Sale and Continues Purchasing and Reselling Famjams Products**

30.    Facing significant financial struggles, iMedia filed for Chapter 11 bankruptcy on June 28, 2023.

31.    On August 15, 2023, iMedia and IV Media executed an Asset Purchase Agreement ("APA") whereby IV Media purchased substantially all the assets of iMedia free and clear of all liens, claims and encumbrances pursuant to section 363 of the Bankruptcy Code and as further outlined in the APA. The terms of the APA expressly preclude, and protect ShopHQ from, except as specifically assumed, pre-closing liabilities. On August 15, 2023, the United States Bankruptcy Court for the District of Delaware entered an Order (the "Sale Order") (i) authorizing the sale of substantially all of the Debtors' assets free and clear of all encumbrances other than assumed liabilities; (ii) approving the Debtors' entry into the Asset Purchase Agreement; (iii) authorizing assumption and assignment of certain executory contracts and unexpired leases; and (iv) granting related relief. The APA and the Sale Order are matters of public record and are available through

PACER and for free from iMedia's bankruptcy claims and noticing agent at https://cases.stretto.com/imediabrands/court-docket/sale-documents/.

32.     After purchasing all or substantially all of iMedia and desiring to continue operation of the ShopHQ Platforms, IV Media, doing business as ShopHQ, continued to purchase goods using iMedia's existing and historical purchase orders with many of iMedia's former successful (and presumably trustworthy) product vendors.

33.     Specifically, based on iMedia's success selling Sterling and other Famjams products prior to and during the pandemic, which effort was led by Friedman and Lalo, ShopHQ continued to purchase significant volumes of products from Invicta (through Sterling) and Famjams for retail sale on the ShopHQ Platform.

34.     All ShopHQ purchases from Famjams were executed through purchase orders, which expressly state that "[t]he Key Business Terms and Policies set forth in the Vendor Onboarding Summary are incorporated by reference." By accepting and shipping merchandise pursuant to the Vendor Onboarding Summary, Famjams agreed to be bound by its terms.

35.     Specifically, Famjams agreed to the following obligations set forth in the Vendor Onboarding Summary:

> **(a) Warranties.** Vendor warrants to [ShopHQ] that for a period of 24 months from the sale of the product to end consumer, all products and services will : (a) be free from any defects in workmanship, material, and design; (b) conform to applicable specifications, drawings, designs, samples and other requirements specified by [ShopHQ]; (c) be fit for their intended purpose and operate as intended; (d) be merchantable; (e) be free and clear of all liens, security interests or other encumbrances; and (f) not infringe or misappropriate any third party's patent or other intellectual property rights. These warranties survive any delivery, inspection, acceptance, or payment of or for the products or services by [ShopHQ]. These warranties are cumulative and in addition to any other warranty provided by law, contract or equity. Any applicable statute of limitations runs from the date of [ShopHQ]'s discovery of the noncompliance of the products or services with the foregoing warranties.

**(b) Indemnification.** Vendor shall defend, indemnify and hold harmless [ShopHQ], its subsidiaries and affiliates, and its and their respective, officers, directors, members, managers, employees, representatives, agents, successors and assigns, and [ShopHQ]'s customers (each of the foregoing, an "Indemnitee" and collectively, the "Indemnitees") from and against any and all loss, injury, death, damage, liability, claim, deficiency, action, judgment, interest, award, penalty, fine, cost or expense, including reasonable attorney and other professional fees and costs, and the costs of enforcing any right to indemnification or pursuing any insurance coverage, which arises out of or occurs in connection with (i) Vendor's products or services (including, without limitation, product liability and marketing representations, claims or disclosures), (ii) Vendor's negligence, willful misconduct or breach of any provision of any PO, or (iii) any claim that any Indemnitee's use or possession of Vendor's products or services infringes or misappropriates the patent, copyright, trade secret or other intellectual property rights of any third party. Vendor shall not settle any claim without the affected Indemnitee's prior written consent unless such settlement includes an unconditional release of Indemnitees from all liability arising out of such claim, does not contain any admission or statement suggesting any wrongdoing or liability by any Indemnitees, and does not contain any equitable order, judgment or term (other than the fact of payment or the amount of such payment) that in any manner affects, restrains or interferes with the business or reputation of any Indemnitee.

**(c) Compliance with Laws, Regulations, and Industry Standards.** Vendor represents, warrants and covenants that: (a) Vendor does and will operate its business in accordance with all applicable laws, regulations and industry standards; (b) each spokesperson or guest provided by Vendor in connection with the products or services is its agent, and Vendor shall make or cause to be made full payment of all compensation due to spokespersons, guests and any other of Vendor's agents, as well as its representatives and contractors, rendering services or furnishing materials in connection with any PO; (c) all Vendor products or services, including their manufacturing, production, importation, transportation, labeling, packaging, pricing, discounting, safety, testing (relating, without limitation, to function, safety, regulatory compliance, and substantiation of products or services claims), marketing, promotion, sale, and distribution, are and will be in compliance with all applicable laws, regulations and industry standards.

**(d) Attorneys' Fees.** The prevailing party in any enforcement action in connection with any PO or this Vendor Onboarding Agreement will be entitled to recover reasonable attorneys' fees and all costs. The prevailing party shall be determined by an assessment of which party's arguments or positions on major issues can fairly be said to have prevailed over the other.

**(e) Cumulative Remedies**. The rights and remedies under each PO and this Vendor Onboarding Agreement are cumulative and are in addition to and not in

substitution of any other rights and remedies available at law or in equity or otherwise.

36.    As part of ShopHQ's purchase of iMedia, ShopHQ also acquired unsold Gucci inventory that had been by purchased by iMedia from Famjams based on Friedman's representations as to the authenticity of such products, and the control he exerted as a shareholder and Director of iMedia. ShopHQ continued to sell these Gucci-branded products after the bankruptcy sale to IV Media. Relying on the representations made by Famjams, the certificates of authenticity required and provided for all luxury items, including Gucci-branded products, as well as the prior course of dealings between iMedia, Freidman, and his wholly-owned companies, Famjams and Sterling, ShopHQ, in addition to the leftover iMedia inventory, continued selling Gucci handbags purchased from Famjams as iMedia had done. Given Friedman's unique position of trust and his fiduciary duties to iMedia as a former Director of the company, ShopHQ reasonably believed that Friedman and his company, Famjams, were reputable suppliers whose representations could be relied upon and trusted.

37.    Throughout this time, ShopHQ believed that Famjams delivered what it had promised to deliver: genuine authentic luxury merchandise from Gucci. ShopHQ had no reason to conclude otherwise given the various representations made by Friedman and others, the certificates of authenticity that accompanied all Gucci-branded products purchased from Famjams, and the consequences of trafficking counterfeit items into the United States.

**E.    ShopHQ Ceases Advertising and Sales of Gucci Handbags Upon Receipt of Gucci's Cease & Desist Letter**

38.    On or about April 26, 2024, Plaintiff sent ShopHQ the Gucci Demand Letter from Gucci's counsel alleging that ShopHQ marketed and sold counterfeit Gucci handbags and

demanding that ShopHQ "immediately and permanently cease all sales, distribution, and display; remove Gucci images from advertising; identify all suppliers; among other actions."

39.     On or about May 6, 2024, the approximate date that ShopHQ's General Counsel was forwarded the Gucci Demand Letter, ShopHQ immediately ceased advertising and selling Gucci handbags on its online and television platforms and began its own investigation to determine what products were allegedly counterfeit, including contacting the vendor of record for the alleged counterfeit products, Famjams, in order to verify the authenticity of the handbags.

40.     ShopHQ's investigation confirmed that the alleged counterfeit Gucci handbags had been purchased from Famjams.

### F.  Friedman Affirms the Authenticity of the Gucci Handbags Sold by Famjams

41.     On or about June 14, 2024, ShopHQ's CEO Cavitt Randall ("Randall") spoke with Friedman by phone concerning Gucci's allegations. Randall advised Friedman in sum or substance that ShopHQ had relied on Famjams' representations and warranties that the Gucci products purchased from Famjams were authentic and not counterfeits. Randall also told Friedman that based on the Gucci Demand Letter, ShopHQ now had good reason to believe that those representations were false when made and that Famjams did not uphold its end of the bargain. In response, Friedman doubled down on Famjams' misrepresentations, stating once again that the products sold were authentic and that Famjams had documentation to support the authenticity of the products. Cavitt asked Friedman to share that documentation; however, to date, Famjams has provided no such further documentation.

42.     Later that day, Cavitt emailed Friedman the Gucci Demand Letter and wrote:

> You have assured me that all items have been purchased by Famjams from Authorized Sellers of Gucci, just not necessarily in the United States, and that all product is genuine Gucci and not counterfeit as the letter suggests. As we agreed, [ShopHQ] will be returning all

Gucci branded inventory purchased from any of your companies and will offset against payables unless you prefer to pay for the returned.

43.    Friedman responded by email on June 17, 2024, reaffirming and certifying the authenticity of the Gucci branded products sold to ShopHQ: "Just to clarify, per our conversation on Friday, I assured you that all items have been purchased legally with proper invoices and that *all the product is 100% genuine and was purchased from authorized sellers of Gucci* but not necessarily by Famjams" (emphasis added). Friedman also agreed "to take back any NEW inventory in perfect condition with all packaging included" (emphasis in original).

44.    Meanwhile, Rokowsky also confirmed that Gucci handbags sold by Famjams to ShopHQ for resale were originally sourced directly from Kering and all "c[a]me with the paperwork, serial numbers and RFID tracking providing their authenticity.[3]

45.    In response to the Gucci Demand Letter, ShopHQ shipped the remaining Gucci handbags and all other Gucci products previously purchased from Famjams back to Famjams for credit.

46.    On or about June 3, 2025, ShopHQ, through its undersigned counsel, sent correspondence to Friedman notifying Famjams of ShopHQ's right to indemnification pursuant to Paragraph 7.2 of the MSA and asked Famjams to confirm that (a) it was complying with its obligations under Paragraph 9.5 to maintain general liability insurance and (b) it had notified its insurance carrier of the claims asserted in Plaintiff's Complaint. The letter also provided notice of Famjams' breach of its obligations to ShopHQ, "including but not limited to breaches of Famjams' warranties and representations in Paragraph 7.2" of the MSA. On or about June 9, 2025, ShopHQ's

---

[3] Upon information and belief, Kering is the holding company that owns and manages the Gucci brand among other luxury and designer brands.

undersigned counsel forwarded its June 3rd correspondence to Famjams' counsel of record in this action. Neither Famjams nor its counsel has responded.

## FIRST CAUSE OF ACTION
### Breach of Contract
(Against Famjams)

47.     ShopHQ realleges and incorporates by reference all allegations set forth above.

48.     The MSA and Vendor Onboarding Summary are binding and enforceable contracts entered into between Famjams and iMedia/ShopHQ.

49.     Famjams sold Gucci-branded handbags to iMedia and ShopHQ. Plaintiff has alleged that such merchandise was counterfeit. If the Plaintiff's allegations are true, Famjams materially breached its express contractual warranties in the MSA and Vendor Onboarding Summary, which were the agreements governing those sales.

50.     ShopHQ performed its obligations under the contracts including by paying for the Gucci-branded handbags it purchased from Famjams.

51.     The Gucci handbags were purchased in order to be resold in the ordinary course of ShopHQ's business.

52.     As a result of Famjams' alleged or potential breaches of contract, ShopHQ is facing possible liability to Plaintiff, including damages, the cost of defense and its own attorneys' fees, and has been damaged in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### Fraud
(Against Famjams)

53.     ShopHQ realleges and incorporates by reference all allegations set forth above.

54.     Beginning on or about January 5, 2023, Famjams, by way of Friedman and Rokowsky, materially and knowingly misrepresented the condition of the Gucci-branded

merchandise it sold to ShopHQ, representing that the merchandise was authentic, was not counterfeit, and did not violate the trademarks or other rights of third parties.

55.    Further, Famjams forwarded iMedia certain specifications for the Gucci handbags, including, among other things, representations that the handbags were each accompanied by a dust bag and certificate of authenticity, in compliance with iMedia's vendor onboarding requirements.

56.    Additionally, Famjams provided iMedia with a spreadsheet that provided a photo of and linked each handbag style purchased by iMedia from Famjams to the respective product page on Gucci's website, further representing and certifying the authenticity of each handbag.

57.    If the Plaintiff's allegations that the Gucci-branded handbags purchased by ShopHQ were counterfeit are true, Famjams knew such representations of authenticity and trademark violations were false when intentionally made.

58.    If the Plaintiff's allegations are true, in making all such material and false misrepresentations concerning the merchandise at issue, Famjams intended to defraud ShopHQ.

59.    Famjams intended for iMedia and ShopHQ to rely on its representations of authenticity and compliance with all applicable laws and regulations, and knew that iMedia and ShopHQ would not purchase Gucci-branded products without the representations made by them.

60.    ShopHQ reasonably and justifiably relied on the representations made by Friedman and other Famjams representatives that the Gucci merchandise was authentic and not counterfeit and did not violate the trademark or other rights of third parties.

61.    If the Plaintiff's allegations are true, the material and fraudulent misrepresentations made by Famjams caused significant pecuniary damages to ShopHQ in an amount to be determined at trial, plus attorneys' fees, costs and expenses, and additional damages and costs including treble damages, as it may incur because of the claims made by Plaintiff against it.

## THIRD CAUSE OF ACTION
### Negligent Misrepresentation
(Against Famjams)

62.    ShopHQ repeats and realleges the allegations of all of the preceding paragraphs as though fully set forth herein.

63.    Famjams, as a longstanding and seemingly reliable  supplier of ShopHQ and its predecessor iMedia, owed a duty of care to iMedia and ShopHQ to provide accurate and truthful information about the authenticity of products sold.

64.    Famjams made a variety of representations to iMedia and ShopHQ concerning the authenticity of Gucci-branded products sold to iMedia and ShopHQ, which iMedia and ShopHQ relied on to purchase those goods.

65.    If the Plaintiff's allegations are true, the representations made by Famjams concerning the authenticity of the Gucci-branded products were false when made, as Plaintiff asserts that those products are counterfeit in violation of federal and state trademark law.

66.    If the Plaintiff's allegations are true, Famjams failed to exercise reasonable care in certifying the authenticity of the Gucci-branded products sold to iMedia and ShopHQ, and knew or should have known that its representations were false.

67.    Famjams knew or should have known that iMedia and ShopHQ would not have purchased Gucci-branded products without the representations made by Famjams and its representatives. In the alternative, it was reasonably foreseeable that iMedia and ShopHQ would rely on the representations made by Famjams when purchasing the Gucci-branded products.

68.    iMedia and ShopHQ reasonably and justifiably relied on Famjams' representations concerning the authenticity of the Gucci products purchased.

69.     If the Plaintiff's allegations are true, as a direct and proximate cause of iMedia's and ShopHQ's reliance on Famjams' false representations, ShopHQ has suffered damages in an amount to be determined at trial, plus fees, costs and expenses, and additional damages and costs including treble damages, as it may incur because of the claims made by Plaintiff against it.

## FOURTH CAUSE OF ACTION
### Breach of Express Warranty in Violation of U.C.C. § 2-313
(Against Famjams)

70.     ShopHQ repeats and realleges the allegations of all of the preceding paragraphs as though fully set forth herein.

71.     The MSA executed by iMedia and Famjams in 2019 includes promises, warranties, covenants and representations by Famjams that "each Fulfillment Product, together with all packaging, labels and other collateral materials provided by [Famjams] ('Related Materials') shall (a) be free from defects in manufacturing, workmanship or materials including without limitation such defects as would cause personal injury or create a hazard to life or injury or damage to property, (b) be fit for its intended purpose and be suitable for use and human consumption, be manufactured and otherwise be in compliance with all applicable federal, state and local laws and all orders and regulations promulgated thereunder, including without limitation any food labeling, disclosure and safety laws; (c) conform to all specifications and other descriptions set forth or incorporated herein, in a SOW, or other Related Materials, (d) possess all performance qualities and characteristics claimed in advertisements or other printed materials issued or authorized by [Famjams] or the manufacturers or producers of the Products, …" MSA § 7.2.

72.     When iMedia decided in January 2023 to start purchasing Gucci handbags from Famjams and reselling them, Famjams and its agents and representatives, including Friedman,

guaranteed the authenticity of those handbags to both iMedia and, later, ShopHQ, and represented that Famjams was an authorized reseller of Gucci handbags.

73.    Further, in or about December 2022 or January 2023, Famjams sent iMedia certain specifications for the Gucci handbags, including, among other things, representations that the handbags were each accompanied by a dust bag and certificate of authenticity.

74.    After ShopHQ decided to continue purchasing goods from Famjams, including Gucci-branded products, Famjams shipped goods through purchase orders which incorporated the Vendor Onboarding Summary through which Famjams warranted that its products do "not infringe or misappropriate any third party's patent or other intellectual property rights" and that they "will be in compliance with all applicable laws, regulations and industry standards."

75.    iMedia and ShopHQ relied on the representations made by Famjams, the certificates of authenticity required and provided for all luxury items, including Gucci-branded products, as well as the representations made in the MSA and Vendor Onboarding Summary in their decision to purchase the Gucci-branded handbags from Famjams.

76.    Plaintiff has alleged that the Gucci-branded handbags sold to iMedia and ShopHQ by Famjams were counterfeit. If Plaintiff's allegations are true, Famjams breached its express contractual warranties in the MSA and the Vendor Onboarding Summary, which were the agreements governing those sales.

77.    ShopHQ first provided notice to Famjams of its breach of express warranty on or about June 14, 2024 when ShopHQ's CEO, Randall, told Friedman by phone in sum or substance that ShopHQ had relied on Famjams' representations and warranties of authenticity of the Gucci products purchased and that based on Gucci Demand Letter, ShopHQ now believed those representations were false and Famjams had failed to uphold its end of the agreement.

78.     Further notice was provided later that day when Randall forwarded Friedman the Gucci Demanded Letter, confirmed Friedman's representation that "all items had been purchased by FamJams from Authorized Sellers of Gucci,…. and that all product is genuine Gucci and not counterfeit as the letter suggests." Randall also affirmed in writing Famjams' agreement that ShopHQ would be returning all Gucci products purchased from Famjams for a credit.

79.     Additional notice of Famjams' breach of its express warranty was provided on or about June 3, 2025 when ShopHQ sent Famjams correspondence demanding that Famjams honor its obligation to indemnify and defend ShopHQ with respect to this litigation and notifying Famjams that the claims asserted by Gucci involved "Famjams' obligations under the Agreement, including but not limited to breaches of Famjams' warranties and representations in Paragraph 7.2" of the MSA.

80.     Accordingly, if the Plaintiff's allegations are true, Famjams is liable for all damages to ShopHQ that have proximately resulted from its express breaches of warranty, including but not limited to, damages consisting of the purchase price, value of genuine goods, lost profits, costs, expenses and any potential liability and defense costs incurred by ShopHQ arising from the purchase and sale of allegedly counterfeit Gucci handbags from Famjams.

## FIFTH CLAIM FOR RELIEF
### Contractual Indemnification
(Against Famjams)

81.     ShopHQ repeats and realleges the allegations of all of the preceding paragraphs as though fully set forth herein.

82.     Under both the MSA and Vendor Onboarding Summary, Famjams owes ShopHQ a duty of indemnification for any and all claims, losses, demands, damages, costs, liabilities and expenses (including reasonable attorneys' fees and cost of settlement) as a result of Plaintiff's Complaint herein.

83.    The exact amount of ShopHQ's damages is not known at this time and shall be proven at trial.

### SIXTH CLAIM FOR RELIEF
### Breach of the Implied Covenant of Good Faith and Fair Dealing
(Against Famjams)

84.    ShopHQ repeats and realleges the allegations of all of the preceding paragraphs as though fully set forth herein.

85.    ShopHQ and Famjams entered into and are parties to the December 2019 MSA and the Vendor Onboarding Summary, which are valid, enforceable, and binding contracts.

86.    Under the MSA, Famjams covenanted that each Fulfillment Product sold to iMedia and ShopHQ, including the Gucci handbags, would be "be manufactured and otherwise be in compliance with all applicable federal, state and local laws and all orders and regulations promulgated thereunder."

87.    Under the Vendor Onboarding Summary, Famjams warranted that all products and services sold to iMedia and ShopHQ would "not infringe or misappropriate any third party's patent or other intellectual property rights" and "are and will be in compliance with all applicable laws, regulations and industry standards."

88.    iMedia and ShopHQ believed that Famjams made these representations and warranties in good faith given its reputation in the luxury and design goods industry and involvement of Friedman in the negotiation of the MSA between iMedia and Famjams.

89.    If the Plaintiff's allegations are true, Famjams took advantage of iMedia and ShopHQ's trust in Friedman and his relationship with both iMedia and Famjams and, in turn, made a profit from selling counterfeit Gucci handbags to iMedia and ShopHQ for over a year.

90.    If the Plaintiff's allegations are true, Famjams, by way of Friedman, did not admit its wrongdoing and instead continued to falsely represent that the handbags were genuine and authentic.

91.    Famjams also refused to cooperate with ShopHQ to respond to the Gucci Demand Letter and address ShopHQ's requests for indemnification.

92.    If the Plaintiff's allegations are true, by selling counterfeit goods in violation of the parties' agreements, continuing to make false representations of the authenticity of the Gucci handbags, knowingly violating the duty of care it owed to iMedia and ShopHQ as a commercial and contractual provider of goods, and subsequently refusing to acknowledge its obligation to indemnify Famjams for the losses incurred as a result of purchasing the counterfeit Gucci handbags, Famjams has breached its implied duty of food faith and fair dealing.

93.    As a direct and proximate cause of Famjams' material breaches of this duty, ShopHQ has been—and will continue to be—deprived of the benefit of its bargain under the contracts and has suffered damages in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION
### Equitable Contribution
(Against Famjams)

94.    ShopHQ repeats and realleges the allegations of all of the preceding paragraphs as though fully set forth herein.

95.    ShopHQ denies any and all allegations of wrongdoing in the Complaint.

96.    Famjams owed iMedia and ShopHQ a duty of care as a supplier of goods for iMedia and ShopHQ for the purposes of reselling to consumers, which created both a commercial and contractual relationship between iMedia and ShopHQ and Famjams.

97.     Famjams was the source of the counterfeit Gucci handbags to be resold by ShopHQ and identified in the Complaint.

98.     If the Plaintiff's allegations are true, because Famjams sold the counterfeit Gucci handbags to iMedia and ShopHQ, Famjams breached its duties to iMedia and ShopHQ to sell products that do not infringe upon any rights or laws, and Famjams caused and contributed to the alleged injury and damages sustained by Plaintiff.

99.     If the Plaintiff's allegations are true, as a result of their breaches of duty, Famjams directly and proximately caused any injuries allegedly suffered by Plaintiff.

100.    As a result, should ShopHQ be found liable for common law trademark infringement, unfair competition, and/or dilution under New York law, ShopHQ is entitled to contribution from Famjams, including but not limited to, any sums paid as a result of a judgment, costs and attorneys' fees, and any other costs incurred by ShopHQ, for the same.

101.    The amount of Famjams' contribution shall be determined based on the amount of damages to be proven at trial.

## EIGHTH CAUSE OF ACTION
### Breach of Implied Warranty of Merchantability in Violation of U.C.C. § 2-314
(Against Famjams)

102.    ShopHQ repeats and realleges the allegations of all of the preceding paragraphs as though fully set forth herein.

103.    A warranty that goods shall be merchantable is implied in every contract for their sale. To be merchantable, goods must be at least fit for the ordinary purpose for which such goods are used.

104.    Famjams' Gucci-branded handbags are a "good" subject to the implied warranty of merchantability, and at no point did Famjams disclaim or limit this warranty.

105.    Famjams is a merchant who regularly sells Gucci-branded handbags and other consumer goods to ShopHQ and other resellers.

106.    By selling Gucci-branded merchandise that was certified and represented as authentic and genuine by Famjams, Famjams impliedly warranted that the handbags would be defect-free and fit for their ordinary purpose. Gucci-branded handbags are not defective and fit for their ordinary purpose if they are genuine and authentic, not counterfeit.

107.    By selling ShopHQ (and iMedia) allegedly counterfeit Gucci handbags, Famjams did not provide ShopHQ with goods that were free of defects or fit for their ordinary purpose. Instead, ShopHQ received merchandise that they did not bargain for, that allegedly violated numerous federal and state laws, and that were marketed to consumers as something they were allegedly not.

108.    ShopHQ first provided notice to Famjams of its breach of warranty on or about June 14, 2024 when ShopHQ's CEO, Randall, told Friedman by phone in sum or substance that ShopHQ had relied on Famjams' representations and warranties of authenticity of the Gucci products purchased and that based on Gucci Demand Letter, ShopHQ now believed those representations were false and Famjams had failed to uphold its end of the agreement.

109.    Further notice was provided later that day when Randall forwarded Friedman the Gucci Demanded Letter, confirmed Friedman's representation that "all items had been purchased by FamJams from Authorized Sellers of Gucci,…. and that all product is genuine Gucci and not counterfeit as the letter suggests." Randall also affirmed in writing Famjams' agreement that ShopHQ would be returning all Gucci products purchased from Famjams for a credit

110.    Additional notice of Famjams' breach of warranty was provided on or about June 3, 2025 when ShopHQ sent Famjams correspondence demanding that Famjams honor its

obligation to indemnify and defend ShopHQ with respect to this litigation and notifying Famjams that the claims asserted by Gucci involved "Famjams' obligations under the Agreement, including but not limited to breaches of Famjams' warranties and representations in Paragraph 7.2" of the MSA.

111.    If Plaintiff's allegations are true, the Gucci-branded handbags were not merchantable and Famjams breached the implied warranty of merchantability as a result.

112.    If ShopHQ had known that the Gucci-branded handbags were counterfeit, as Plaintiff alleges, and therefore not merchantable, ShopHQ would not have purchased them.

113.    As a result of Famjams' breach, ShopHQ has suffered an injury and is entitled to damages in an amount to be proven at trial.

## NINTH CAUSE OF ACTION
### Breach of Warranty of Non-Infringement in Violation of U.C.C. § 2-312
(Against Famjams)

114.    ShopHQ repeats and realleges the allegations of all of the preceding paragraphs as though fully set forth herein.

115.    Famjams is a merchant who regularly sells Gucci-branded handbags and other consumer goods to ShopHQ and other resellers.

116.    Pursuant to the MSA and Vendor Onboarding Summary, Famjams warranted to ShopHQ that Famjams' merchandise sold to ShopHQ would not infringe upon the trademarks of any third party.

117.    ShopHQ did not furnish specifications for the Gucci-branded products to Famjams.

118.    Plaintiff has alleged that the Gucci-branded handbags sold to ShopHQ by Famjams infringed upon its trademarks in violation of federal and state laws. If Plaintiff's allegations are true, Famjams has breached the warranty of non-infringement.

119.   ShopHQ first provided notice to Famjams of its breach of warranty on or about June 14, 2024 when ShopHQ's CEO, Randall, told Friedman by phone in sum or substance that ShopHQ had relied on Famjams' representations and warranties of authenticity of the Gucci products purchased and that based on Gucci Demand Letter, ShopHQ now believed those representations were false and Famjams had failed to uphold its end of the agreement.

120.   Further notice was provided later that day when Randall forwarded Friedman the Gucci Demanded Letter, confirmed Friedman's representation that "all items had been purchased by FamJams from Authorized Sellers of Gucci,.... and that all product is genuine Gucci and not counterfeit as the letter suggests." Randall also affirmed in writing Famjams' agreement that ShopHQ would be returning all Gucci products purchased from Famjams for a credit.

121.   Additional notice of Famjams' breach of warranty was provided on or about June 3, 2025 when ShopHQ sent Famjams correspondence demanding that Famjams honor its obligation to indemnify and defend ShopHQ with respect to this litigation and notifying Famjams that the claims asserted by Gucci involved "Famjams' obligations under the Agreement, including but not limited to breaches of Famjams' warranties and representations in Paragraph 7.2" of the MSA.

122.   As a result of Famjams' breach, ShopHQ has suffered an injury and is entitled to damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Cross-Claimant IV Media d/b/a ShopHQ respectfully requests that the Court:

(a)   Award damages in favor of ShopHQ in an amount to be determined at trial, including statutory and punitive damages;

(b)      Award ShopHQ its costs, including reasonable attorneys' fees and expenses, and expert fees;

(c)      Grant such other relief including pre- and post-judgment interest, as may be just and proper.

## JURY DEMAND

ShopHQ hereby demands a trial by jury on all issues so triable.

Dated: June 30, 2025
       New York, New York

Respectfully submitted,

**HARRIS ST. LAURENT & WECHSLER LLP**

By: */s/ Yonaton Aronoff*
       Yonaton Aronoff, Esq.
       Megan Dubatowka, Esq.
       40 Wall Street, 53rd Floor
       New York, New York 10005
       E: yaronoff@hs-law.com
       E: mdubatowka@hs-law.com
       Tel.: (212) 397-3370

*Attorneys for Defendant IV Media, LLC d/b/a ShopHQ*